**Opinion filed June 15, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00359-CV

_____

## IN THE INTEREST OF M.M. AND P.M., CHILDREN

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause No. CV2146213**

### M E M O R A N D U M   O P I N I O N

This is an appeal from an order in which the trial court, based upon the jury's verdict, terminated the parental rights of the father to the children, M.M. and P.M. *See* TEX. FAM. CODE ANN. § 161.001 (West 2022). Appellant, the father, filed this appeal. In three issues, he challenges the sufficiency of the evidence supporting termination of his parental rights. We affirm the order of termination.

*Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. FAM. §§ 161.001(b), 161.206(a), (a-1). To terminate one's parental rights

under Section 161.001, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(U) and that termination is in the best interest of the child. *Id.* In this case, the trial court terminated Appellant's parental rights in accordance with the jury's verdict. After being instructed pursuant to Sections 161.001(b) and 161.003(a), the jury answered the questions posed in the trial court's charge. The jury found that Appellant had committed three of the acts listed in Section 161.001(b)(1)—those found in subsections (D), (E), and (O). Specifically, the jury found that Appellant had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being. *See id.* § 161.001(b)(1)(D). The jury also found that Appellant had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See id.* § 161.001(b)(1)(E). Finally, the jury found that Appellant failed to comply with the provisions of a court order that specifically established the actions Appellant needed to take to obtain the return of his children. *See id.* § 161.001(b)(1)(O).

In addition to the findings under Section 161.001(b)(1), the jury also found, pursuant to Section 161.003, that Appellant has a mental or emotional illness or a mental deficiency that renders him unable to provide for the physical, emotional, and mental needs of the children; that Appellant's illness or deficiency will, in all reasonable probability, continue until the children's eighteenth birthdays; that the Department of Family and Protective Services has been the managing conservator of the children for the six months preceding the termination hearing; and that the Department had made reasonable efforts to return the children to the parents. *See id.* § 161.003(a)(1)–(4).

Finally, the jury found that termination of Appellant's parental rights would be in the best interest of the children. *See id.* §§ 161.001(b)(2), 161.0003(a)(5).

2

To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We note that the jury is the sole arbiter of the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

*Procedural and Factual Background*

Immediately after P.M. was born, the Department quickly became concerned about the welfare of both M.M. and P.M. The trial record revealed a long history of allegations of abuse or neglect against the mother and Appellant as to other children. Allegations of abuse and neglect dated back to 2016 for the mother and 2005 for Appellant. All of the allegations of abuse or neglect to the parents' older children occurred outside of the State of Texas. There was also a prior allegation of neglect of M.M. in California, and when she was three months old, M.M. was removed from the parents' care for approximately thirteen months beginning in October 2019. M.M. was returned to her parents' care on a monitored return in November 2020—prior to the family moving to Texas.

Both the mother and Appellant had been previously diagnosed with mental illness and mental disorders. The mother was diagnosed with bipolar disorder, post-traumatic stress disorder, and anxiety. Appellant was diagnosed with narcissistic traits, histrionic traits, and some compulsive traits. Appellant also described his relationship with the mother as "like a drug to him"—when she was gone "it was the worst experience he could fathom," and when they were together, "he was in heaven." Appellant exhibited some codependent behaviors placing the mother's needs before the needs and safety of his children.

Evidence of the mother's lack of ability to care for the children was presented in letters written by Appellant and his four eldest children in June 2017. The letters detail neglectful, abusive, and manipulative behaviors by the mother, in an effort to gain custody of one of the mother's biological children who had been living with the family. Despite these claims of neglect and abuse, at the time of trial Appellant was still in a relationship with the mother and either denied or made excuses for the mother's detrimental behavior described in his 2017 letter.

4

According to testimony from an investigator with the Department, the first service plan for the parents in Texas was created approximately two months before M.M. was removed from her parents' care. At that time, the service plan instructed the parents that they could not live in their Cisco, Texas residence with M.M. because there were hazards in the home, and that M.M. was to remain with family in Lampasas, Texas. The Cisco residence was described as a "schoolhouse" that, as of May 2021, had no windows, glass on the floor, piles of trash, a bottle of urine and a bucket of feces on the floor, with standing water and raw sewage—all of which were accessible to the child, M.M. One of the images admitted into evidence also depicted a man and a child sitting between two tents in one of the rooms, with ladders leaning against the wall. The investigator indicated that the family was living in tents set up in the schoolhouse at that time. Another Department investigator described the smell as "atrocious" and testified that she did not observe any toys, appropriate bedding, clean bottles or cups, or adequate food during the visit. Appellant testified that despite the bucket of feces and bottle of urine, the lack of air conditioning, or the state of the Cisco residence, Appellant had blocked off certain areas and believed it to be safe for children.

In July 2021, law enforcement alerted the Department that immediate response was needed at a restaurant. An investigator testified that M.M. was in a vehicle in her car seat with her half-brother,[1] and that the vehicle was turned off. M.M. was described as dirty, wet, sweaty, and smelling of body odor, feces, and urine. An investigator for the Department testified that, at that time, M.M.'s basic needs were not being met. A new family plan was created following the removal of M.M. The primary permanency goal was family reunification. During this time, the mother was pregnant with P.M. After P.M. was born in December 2021, a new

---

[1]M.M.'s 22-year-old half-brother, lives with Appellant and M.M.'s mother and is autistic.

family plan was created for P.M., and the primary permanency goal at that time was also family reunification.

Cynthia Newton, a licensed clinical social worker, testified that she was assigned to work with Appellant and the mother—both individually and as a couple. Newton eventually stopped working with the mother after she voluntarily relinquished her parental rights to both M.M. and P.M. prior to the termination hearing. Newton established several objectives for the sessions with Appellant: to identify triggers for angry outbursts and identify coping skills to manage his anger, to identify protective parenting skills and how to apply those to the supervised visitation with his children, and to identify past controlling behaviors in his relationship and how to positively interact with his partner and have effective and open communication in his relationship. However, Newton reported that none of these objectives were completed.

Regarding their ability and success in creating a safe and healthy home environment, Newton testified to a lack of personal hygiene that Appellant and the mother appeared to have. Instead of responding to questions about personal hygiene, they would ignore or not answer direct questions about how recently they had bathed. Newton testified that during the sessions with Appellant, he was often disheveled, dirty, and smelled strongly of body odor. Appellant told Newton on more than one occasion that he liked dirt because it made him feel as though he had worked. These attitudes were reflected in the condition of the home and the care of the children. Newton testified that the parents did not understand *why* the home needed to be cleaned or why there was such a concern for the level of cleanliness in the home. The mother indicated that when she did not feel well, she would simply put trash on the floor for later—or it would be disposed of by Appellant or his autistic son who lived with them. This conduct occurred in the bathroom as well as other areas of the home. Appellant indicated in sessions with Newton that the mother's

6

refusal to help clean was very frustrating for him. Again, Newton expressed that, in trying to address cleanliness and hygiene issues, the parents would often deflect and look for someone else to blame.

Three of Appellant's adult children testified during the hearing. Two of those children testified that they were removed as children from their parents' care due to lack of cleanliness in the home and of the children. One daughter testified that, when she was a child, the family did not focus on sweeping or mopping all the time—or taking showers—and that the family was "definitely not the most hygienic." Even after she no longer lived with her father and would return to visit, the home "was not kept the best" and would usually smell like urine. She testified that the new home the family was living in was vastly improved from what she had seen previously and just needed "a really, really good wipe down."

Although, Newton testified—and Appellant affirmed in his own testimony—that Appellant indicated that he would choose the children over his wife, Newton also stated that Appellant later told her that he could not be forced to choose his children over his wife. Notwithstanding the mother's termination of parental rights, at the time of trial, Appellant testified that he and the mother were still living together because the children were not in the home at that time. Appellant also testified that he believes that he must be patient with her and show her mercy because she is his wife.

Newton testified that the last two sessions she had with Appellant were hostile and oppressive and led her to contact law enforcement during their final session. She testified that Appellant used the Bible as a tool for veiled threats that were directed to her and others who were working the case. Appellant explained that he was preaching the Bible, and stated, "The Bible says you reap what you sow. If you take away something from somebody else, then God will reckon with that." The court-appointed special advocate (CASA) for the case also testified that, although

her communications with Appellant were appropriate at first, they became harassing and threatening and text messages would arrive at all hours of the day or night. The 2INgage permanency case manager for the case also received harassing telephone and electronic messages which threatened the case manager, the case manager's wife, and the case manager's children. The 2INgage permanency case manager explained: "When things do not go [Appellants] way, [Appellant] turns very hateful and very -- very hostile. It immediately goes to -- it immediately goes to threats."

Appellant also showed Newton pictures taken on his phone of those caseworkers and court personnel involved in investigating or monitoring the case—pictures which included the children of those individuals. When asked about these images at trial, Appellant testified that he was concerned about the qualifications of "any of the case-workers or anybody in the investigation" and felt that because he was being investigated, he should also be able to investigate people—and that he did not think it would be a problem because the images were publicly available on Facebook. Appellant stated that the biblical messages sent to caseworkers in this case were similar to messages that Appellant had sent to prior caseworkers when living in California.

The case manager testified that termination of Appellant's parental rights was in the best interest of the children because Appellant failed to demonstrate the ability to provide safe and stable housing, failed to acknowledge the reasons for the children being removed, failed to acknowledge or address his own mental health issues, and failed to address or acknowledge the volatile relationship with the mother, whose rights to the children have been terminated, or Appellant's codependency on the mother, which relationship he prioritizes over that of the children. The case manager and the foster mother both testified that—in the event Appellant's parental rights were terminated—the foster mother would like to adopt M.M. and P.M. The case manager indicated that the placement with the foster family was a safe and stable

home and environment for the children, and is the home that two of their older brothers were adopted into.

*Analysis*

*Endangering Conduct*

In Appellant's first issue, he challenges the findings made by the trial court under Sections 161.001(b)(1)(D), (E) and (O). Due process mandates a heightened standard of review when addressing a parent's challenge to a trial court's findings under subsection (D) or (E) "because of the potential consequences [of those findings] for parental rights to a different child." *See In re N.G.*, 577 S.W.3d 230, 234–35 (Tex. 2019) (appellate court must provide a detailed analysis if affirming the termination on either of these grounds).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.O.*, 338 S.W.3d 29, 34 (Tex. App.—Eastland 2011, no pet.). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). The offending conduct need not be directed at the child, nor does the child actually have to suffer an injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). With respect to the sufficiency of the evidence to support a finding under subsection (E), "endangering conduct is not limited to actions directed towards the child." *Id.* (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The endangering conduct may include the parent's actions before the child's birth and may relate to the parent's actions while the parent had custody of other children. *Id.*; *In re S.T.*, No. 11-19-00363-CV, 2020 WL 2610393, at *3–4 (Tex. App.—Eastland May 18, 2020, pet. denied) (mem. op.)

(upholding the finding under subsection (E) based upon parent's conduct with other children).

The record shows that M.M. and P.M., were endangered as a direct result of Appellant's conduct. While M.M. was in Appellant's care, he failed to properly care for her personal hygiene, left her unattended in a vehicle without air conditioning circulating in the summer, and could not understand why his conduct and omissions could be harmful to a child. Appellant also referred to "your cleanliness standards" (versus his own lack of standards), rather than making changes to his own personal hygiene habits or acknowledging the need to create better hygiene for his children. Further, although P.M. was removed from the parents' care before she experienced the same circumstances as M.M., the extensive history of poor personal hygiene and deficient care of the children in Appellant's custody demonstrated danger to the health and well-being of P.M. For instance, placing children in unsanitary habitats and leaving children in closed vehicles during Texas summer months to eat lunch with his wife are Appellant's choices that directly endanger the well-being of the children and indicate a lack of understanding of what is required to care for a child and be a responsible parent. Moreover, Appellant continued to live with his wife, whose parental rights were voluntarily relinquished, showing that Appellant prioritized his marital relationship over the needs of his children. Appellants failure to prioritize the *children's* needs continued, even after he acknowledged that the mother was an unfit parent and complained about her continued negative impact on any efforts to improve household cleanliness.

Based on the evidence presented, the trial court could have reasonably found by clear and convincing evidence that Appellant had engaged in a course of conduct that endangered the children. *See J.O.A.*, 283 S.W.3d at 345. Therefore, we hold that the evidence is legally and factually sufficient to uphold the trial court's finding under Subsection (E). Accordingly, we overrule Appellant's first issue. Because

only one statutory ground is necessary to support termination and because we have upheld the jury's finding as to Subsection (E), we need not address Appellant's allegations as to Subsections (D) and (O), or Appellant's second issue. *See* FAM. § 161.001(b)(1); *N.G.*, 577 S.W.3d at 234–35; *see also* TEX. R. APP. P. 47.1.

*Best Interest*

In Appellant's third issue, he challenges the sufficiency of the evidence to support the trial court's findings that termination of his parental rights would be in the best interest of M.M. and P.M.

With respect to M.M. and P.M.'s best interest, the evidence set forth above demonstrates that, despite years of previous efforts to assist Appellant to appropriately parent and care for his children, Appellant has not made and may be incapable of making the necessary changes to do so. Clear and convincing evidence showed that placing M.M. and P.M. in a home with Appellant would create a risk of danger to M.M. and P.M. Appellant continued—even at trial—to avoid addressing his parental deficiencies, deflecting the severity of the harm because his older four children "turned out good," continually excusing the lack of cleanliness in the home and, instead, claiming that others are against him. Regardless of how his older children may have turned out, that is not justification for the inappropriate care to which M.M. and P.M. were subjected. The testimony at trial was overwhelming as to the lack of cleanliness in the home and the lack of care exhibited by both the mother and Appellant. Even the testimony by his older children confirmed that Appellant has always struggled with cleanliness and appropriate hygiene habits— for himself and for the family. Importantly, Appellant was entrenched in his questionable practices, became hostile and threatening towards those working on the children's case and was unable to show that he would consistently prioritize the children's health and safety. Furthermore, the permanency case manager, the current foster parent for M.M. and P.M., and the CASA advocate for the children, all

11

testified that it would be in the children's best interest to terminate the parental rights of Appellant.

The jury saw the evidence and heard the testimony, observing the tone and body language of each witness. The jury, as the trier of fact, is the sole judge of the witnesses' credibility. *A.B.*, 437 S.W.3d at 503. In light of the deference to be given the jury in this regard, the evidence presented at trial, and the *Holley* factors, we conclude that the jury could reasonably have formed a firm belief or conviction that termination of Appellant's parental rights would be in M.M. and P.M.'s best interest. *See Holley*, 544 S.W.2d at 371–72. Upon considering the record as it relates to the emotional and physical needs of the children now and in the future, the emotional and physical danger to the children now and in the future, and the plans for the children by the Department, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Appellant's parental rights is in the best interest of M.M. and P.M. *See id.* We defer to the jury's findings as to the children's best interest, *see C.H.*, 89 S.W.3d at 27, and we cannot hold in this case that the jury's findings as to best interest are not supported by clear and convincing evidence. Accordingly, we overrule Appellant's third issue.

### *This Court's Ruling*

We affirm the order of the trial court.

PER CURIAM

June 15, 2023

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

12